# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

IVOR VAN HEERDEN

                                        CIVIL ACTION

VERSUS

                                        NO. 3:10-CV-155-JJB-CN

BOARD OF SUPERVISORS OF LOUISIANA
STATE UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE, ET AL.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on motions for summary judgment filed against the plaintiff, Ivor van Heerden ("van Heerden"), by defendants: the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU"); Brooks Keel ("Keel"), a former vice chancellor for research and economic development at LSU; Robert Twilley ("Twilley"), a former associate vice chancellor for research and economic development at LSU; David Constant ("Constant"), the former interim dean of the College of Engineering at LSU; and George Voyiadjis ("Voyiadjis"), the chair of the Department of Civil and Environmental Engineering at LSU (collectively, "defendants"). The matter is submitted, and there is no need for oral argument. Jurisdiction over the federal law claims exists under 28 U.S.C. § 1331, and the Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## I. BACKGROUND FACTS

This case arises out of LSU's allegedly wrongful termination of van Heerden for statements he made in the aftermath of Hurricane Katrina which were critical of the U.S. Army Corps of Engineers ("the Corps"). The following facts are undisputed.

In 1992, LSU hired van Heerden to work at the Louisiana Geological Survey, and later at the College of Engineering, as an Associate Professor of Research. (Doc. 54, Ex. A). In 2000, van Heerden co-founded the LSU Hurricane Center and was serving as its Deputy Director when Hurricane Katrina battered the Gulf Coast in 2005. Following the storm, van Heerden was selected by the Louisiana Department of Transportation to head Team Louisiana, a group of scientists tasked with researching what caused the extensive flooding in New Orleans. (van Heerden Affidavit, Doc. 86, Ex. 1). After the storm hit, van Heerden began making public statements suggesting that the Corps failed to properly engineer and maintain New Orleans levees and was to blame for the city's flooding. (*Id.*).

Unfortunately for van Heerden, the LSU administration and many of its faculty did not approve of his statements for fear that they might cause the University to lose federal funding. On a number of occasions, LSU administrators ordered van Heerden not to make public statements or testify regarding the cause of New Orleans' levee failures. (*Id.*). However, van Heerden persisted in making public statements and testified in front of the Louisiana Legislature and the United States Congress. (*Id.*). Thereafter, LSU administrators removed van Heerden from the Louisiana Recovery Association, a group of scientists and professionals assembled by then-Governor Kathleen Blanco to identify the State's post-Katrina needs. (*Id.*).

In May 2006, van Heerden published "The Storm," in which he again hypothesized at length about the Corps' role in the levee failures and exposed LSU's attempt to silence his opinion. (*Id.*). LSU responded by further urging van Heerden not to make public statements and stripping him of his limited teaching duties. (*Id.*).

Ultimately, on April 13, 2009, van Heerden, who had worked for LSU under a series of one-year contracts, was informed that his contract would not be renewed.

## II.  PROCEDURAL HISTORY

On February 10, 2010, van Heerden filed suit against defendants, asserting claims for: (1) *de facto* tenure; (2) defamation; (3) reprisal against a whistle-blower in violation of La. R.S. 23:967; (4) retaliation based on conduct protected by the First Amendment in violation of 42 U.S.C. § 1983 ("§ 1983"); (5) violation of his Fourteenth Amendment rights secured through § 1983;[1] (6) conspiracy to interfere with federal court testimony in violation of 42 U.S.C. § 1985 ("§ 1985"); (7) intentional infliction of emotional distress ("IIED"); and (8) breach of contract against LSU.  Thereafter, this Court granted summary judgment in favor of Defendants on van Heerden's *de facto* tenure (Doc. 61) and defamation (Doc. 80) claims.  However, the Court denied LSU's partial summary judgment motion regarding his whistleblower claim under state law (Doc. 88).  LSU now seeks partial summary judgment relating to the 42 U.S.C. §§ 1983 and 1985 claims against it and the other defendants (Docs. 97, 98), as well as the breach of contract and IIED claims against it (Doc. 98).  Separate summary judgment motions by Keel (Doc. 87), Voyiadjis (Doc. 90), Twilley (Doc. 92) and Constant (Doc. 94) seek dismissal of the First Amendment retaliation claims under § 1983, the § 1985 claims, and the IIED claims.  Van Heerden filed an opposition to Keel's motion (Doc. 95), but then filed a consolidated response in opposition to the rest of the defendants' motions (Doc. 106).  Keel filed a reply (Doc. 104), and the other Defendants filed a combined reply (Doc. 110).

---

[1] Defendants have not moved for summary judgment on these claims, and thus they remain pending.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the Court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

A. § 1983 Claims

The individual defendants[2] in this case seek summary judgment on van Heerden's § 1983 claims for retaliation based on his speech protected by the First Amendment. To establish a § 1983 claim for retaliation related to First Amendment speech, plaintiff must prove four elements: (1) plaintiff suffered an adverse employment action; (2) plaintiff spoke as a citizen on a matter of public concern; (3) plaintiff's interest in the speech outweighed the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007). At the outset, the Court must determine whether van Heerden's speech implicated the First Amendment.

### 1. *Did van Heerden's Speech Constitute Protected First Amendment Speech?*

Defendants assert van Heerden made statements critical of the Corps only pursuant to his official job duties at LSU. As such, they claim the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) exempts van Heerden's speech from First Amendment protection since his statements were made in his employment capacity rather than as a private citizen. Defendants assert van Heerden made those statements based on the special knowledge he received pursuant to his employment duties. This case raises special considerations involving the public employee speech doctrine which implicates widely accepted notions of academic freedom. A detailed look at governing precedent will illuminate the principles of law at work here.

---

[2] Plaintiff concedes he did not sue LSU under § 1983. (van Heerden Memo. in Opp., Doc. 106, p. 24, n. 72).

Of course, *Garcetti* must be the starting point for this analysis. As the Fifth Circuit has noted, *Garcetti* "added a threshold layer to the *Pickering* balancing test." *Williams v. Dallas Ind. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007).[3] *Garcetti* involved a deputy district attorney named Richard Ceballos who, concerned over possible improprieties involving a police affidavit, wrote memos to his supervisors raising his concerns. 547 U.S. at 414. His supervisors did not follow his advice to drop the prosecution based on the supposedly-erroneous police affidavit. *Id.* Ceballos later claimed his supervisors retaliated against him for writing the memo based on subsequent employment actions including reassignment, transfer, and denial of a promotion. *Id.* at 415.

The *Garcetti* Court first cataloged certain factors which bear upon, but do not control, the degree of protection the First Amendment affords a public employee. Those factors included the location where the speech was made[4] and a comparison of the subject matter of the speech and the subject matter of the plaintiff's employment.[5] The Court then concluded that the controlling factor was that Ceballos made and submitted his memo pursuant to his job duties. *Id.* at 421. The majority found several facts bolstered the conclusion that Ceballos' memo was written pursuant to his official job duties, which Ceballos conceded. The first was that writing the memo was required by his job duties. *Id.* at 421-22; *see also Williams*, 480 F.3d at 693 (describing Ceballos'

---

[3] The test from *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) balances a public employee's interests in speaking as a citizen on matters of public concern with the government's interests as an employer in promoting efficiency in the public services it performs. *Pickering*, 391 U.S. at 568.

[4] "That Ceballos expressed his views inside the office, rather than publicly, is not dispositive." *Garcetti*, 547 U.S. at 420.

[5] "The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive." *Garcetti*, 547 U.S. at 421 (citing *Pickering* and noting that, like teachers, "other categories of public employees" enjoy protection for speaking on the subject matter of their employment).

action in writing the memo as a required job activity). The *Garcetti* Court also noted Ceballos was paid to perform that activity. *Id.* at 422. Finally, the Court distinguished official communication (which it found Ceballos performed by directly engaging his supervisors) from unofficial communication, such as the letter a teacher wrote to a newspaper in *Pickering*, which "had no official significance." *Id.* *Garcetti* did not endeavor to "articulate a comprehensive framework for defining the scope of an employee's duties," but it noted that formal job descriptions are neither necessary nor sufficient for finding that the action at issue involves an official job duty. *Id.* at 424-25. As *Williams* points out, the *Garcetti* test focuses on the role the employee occupied when he communicated, rather than the content of the speech. 480 F.3d at 692.

Importantly, *Garcetti* singled out "expression related to academic scholarship or classroom instruction" as arguably implicating "additional constitutional interests that are not fully accounted for by … customary employee-speech jurisprudence." *Id.* at 425. *Garcetti* thus reserved the question whether the test it announced "would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* This reservation responded to Justice Souter's concern that the *Garcetti* decision might "imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write pursuant to official duties." *Id.* at 438 (Souter, J., dissenting) (quotations, citations and internal punctuation omitted).

The Fifth Circuit has further elaborated on the *Garcetti* rule. The *Williams* case applied *Garcetti* to a series of memos written by a high school athletic director to other school administrators regarding the athletic budget. 480 F.3d 689, 690-91. Analyzing the extent to which speech which is not necessarily required by a job duty but is related

to a job duty, the *Williams* court found that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." 480 F.3d at 693. That case, however, while related to education, did not implicate the academic freedom concerns present here.

Another pertinent case is *Nixon v. City of Houston*, 511 F.3d 494 (5th Cir. 2007), which involved statements made by a Houston police officer. The court held a police officer's statements at the scene of an accident involving a fleeing suspect were made pursuant to official job duties because the officer was "on-duty, in uniform, and … working at the scene of the accident." 511 F.3d at 498. Moreover, the officer attempted to get his supervisor's approval before speaking, and department policy made it clear that officers should speak with the media to disseminate information regarding those situations. *Id.* at 498-99. The court further emphasized that whether the statements were either unauthorized or excluded from that particular officer's regular job duties did not alter the analysis. *Id.* The court further held that the same officer's statements to radio and television shows the next day regarding the incident, though made off-duty and presumably approximating citizen speech, were nonetheless unprotected because those later statements were a continuation of the accident-scene statements the officer made the previous day. *Id.* at 499.

Finally, in *Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008), the Fifth Circuit held that a pertinent consideration is whether the employee shared communications regarding his official job duties solely within the chain of command or shared them with persons outside the workplace. 518 F.3d at 313. If a public employee "takes his job concerns to persons outside the work place in addition to raising them up the chain of

command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id.* (citation omitted). *Davis* further held that courts should separately consider discrete topics within a single communication for purposes of applying post-*Garcetti* First Amendment analysis. *Id.* at 314-15 (applying principles from *Connick v. Myers*, 461 U.S. 138 (1983) to analyze "mixed speech" instances where a single communication raises both public and private concerns).

Applying these principles, the Court finds that, although it is a close question, van Heerden was not acting within his official job duties. Van Heerden indisputably worked at LSU as a hurricane expert. After Katrina flooded New Orleans, van Heerden began criticizing the Corps for structural failures of the levees, most notably in a September 20, 2005 article in the *Washington Post*. (van Heerden Affidavit, Doc. 86-1, p. 3; Washington Post article dated September 20, 2005, Doc. 86-2, p. 3). In October 2005, he became head of and spokesperson for Team Louisiana, a group of scientists studying the causes of levee failures in New Orleans during Katrina. Team Louisiana was created by contract between the Louisiana Department of Transportation and Development and LSU, which specified van Heerden as a member. (Team Louisiana Contract, Doc. 97-3). He was eventually designated the team leader and spokesperson. (*See* Final Team Louisiana Report, Doc. 97-6, p. 11).

In his deposition, van Heerden responded to questions about the subject matter and basis for his statements and speeches criticizing the Corps after he began working for Team Louisiana:

> Q: Did you make any statements publicly after October 16, 2006, about any of the matters that you were retained to work on under [the Team Louisiana] contract?

A:  The only – the only – the only materials that I would have presented at speeches or public statements would have been from the Team Louisiana Report.

***

Q:  So after the Team Louisiana Report was issued, you went and made speeches about it?

A:  I reported the science at a large number of scientific presentations as an invited keynote speaker.  I wrote papers.  I published it.  That's part of my book, The Storm.  That's what we do with our research.

(van Heerden Depo., Doc. 97-4, p. 26).

Beginning in October 2006 and lasting through the delivery of the final Team Louisiana report in February 2007 (Final Team Louisiana Report, Doc. 97-6, p. 1), van Heerden also received payments from a group of plaintiff's attorneys regarding non-testifying expert work he performed for them relating to Katrina litigation against the Corps, insurance companies and others.  (Expert Retention Agreement, Doc. 97-5; MR-GO Litigation Payments to van Heerden, Doc. 97-9).  The nature and extent of his work during that period, however, is somewhat unclear.  (van Heerden Depo., Doc. 97-4, pp. 146-52, 156-67).

Viewing the facts in the light most favorable to van Heerden, the Court cannot say he was acting under his official job duties because genuine issues of material fact still exist.  The actions of LSU administrators when dealing with van Heerden make clear that, whatever the formalities of his job description or the general parameters LSU sets for all its academics' relations with the media, LSU considered van Heerden to be acting outside his employment when he spoke on Katrina-related matters with the media.

LSU administrators repeatedly warned van Heerden not to speak with the media. (*See, e.g.,* van Heerden Affidavit, pp. 3-7; van Heerden email to Michael Ruffner and Harold Silverman dated November 15, 2005, Doc. 86-2, p. 8; *New York Times* article dated May 30, 2006, Doc. 86-2, pp. 21-23; Keel email to van Heerden dated August 31, 2007, Doc. 86-4, p. 1).   In response to a *New York Times* article discussing van Heerden's book, "The Storm," and the controversy it engendered with university administrators, the *Times* published a letter to the editor from former LSU Vice Chancellor Michael Ruffner explaining the university's position on van Heerden's work. (Ruffner Letter to *New York Times*, Doc. 86-2, pp. 24-25).   Ruffner rejected the contention that LSU tried to limit van Heerden's access to the media to suppress his voice on Katrina-related matters, instead asserting that LSU administrators simply wanted van Heerden to clarify the subjects to which his expertise extended.   (*Id.*). Ruffner said he and another administrator "apprised Dr. van Heerden of his right to speak to anyone of his choosing on any topic of his choice, but to make sure that that [sic] his comments are known to represent his views, and not those of L.S.U."   (*Id.*). LSU also disavowed its relationship to van Heerden's Katrina-related work for the plaintiff's attorneys.  (Keel email to van Heerden dated May 8, 2008, Doc. 86-4, p. 2).

LSU administrators expressly changed van Heerden's job description to focus solely on research, with a heavy emphasis on publication in peer-reviewed journals rather than through the press, popular literature, or through work with government officials and agencies.   (van Heerden Affidavit, Doc. 86-1, p. 6; Keel email to van Heerden dated December 20, 2006, Doc. 86-2, p. 38).   Van Heerden's faculty

appointment had originally embraced assisting federal and state agencies with natural disasters. (van Heerden Job Description, Doc. 86-1, p. 18).

Viewed in this light, LSU's objective actions appear to have been calculated to disavow itself of van Heerden's statements regarding the cause of levee failure. The Court thus finds that van Heerden's job duties did not require him to make statements to the media, as it appears clear LSU attempted to limit his appearances, discredit his message, and distance itself from his conclusions. Of course, *Williams*' interpretation of *Garcetti* makes clear that, although van Heerden's comments to the media were not *required* by his official job duties, they may nonetheless be unprotected if his speech was made in the course of performing his job duties.

Van Heerden's job description and specified duties consisted of, initially, working on the Team Louisiana report pursuant to LSU's contract with the State in addition to his faculty responsibilities. As van Heerden's job description changed and became more focused on research for scholarly publication, (*see* van Heerden Affidavit, Doc. 86-1), his outside speech became less connected with his LSU employment, and LSU correspondingly became less pleased with his performance.

Defendants contend van Heerden's work with Team Louisiana renders all of his statements pursuant to his official job duties. This ignores that fact that van Heerden began speaking out about the Corps' fault before Team Louisiana was formed. Moreover, the Team Louisiana appointment presumably ended after its final report was submitted. Additionally, to the extent van Heerden spoke out beyond the chain of command and brought his opinions and grievances before legislative bodies and into the view of the broader public via his book, the Fifth Circuit's holding in *Davis* counsels

that those particular instances of speech were made by van Heerden as a citizen and not an employee.

Finally, the Court pauses a moment to make a final comment about *Garcetti*. The concerns about academic freedom raised, but not answered, in that decision are quite relevant here. "Academic freedom is not an easy concept to grasp, and its breadth is far from clear. It has generally been understood to protect and foster the independent and uninhibited exchange of ideas among teachers and students and the serious pursuit of scholarship among members of the academy." *Emergency Coalition to Defend Educational Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 15 (D.C. Cir. 2008) (Edwards, J., concurring). While van Heerden has not argued for an academic's exception to *Garcetti*, neither have defendants pointed the Court to a decision of the Fifth Circuit applying *Garcetti* to an academic. The Court here shares Justice Souter's concern that wholesale application of the *Garcetti* analysis to the type of facts presented here could lead to a whittling-away of academics' ability to delve into issues or express opinions that are unpopular, uncomfortable or unorthodox. Allowing an institution devoted to teaching and research to discipline the whole of the academy for their failure to adhere to the tenets established by university administrators will in time do much more harm than good.

However, based on the facts presented here, the Court finds that, even applying the *Garcetti* test to van Heerden, he was not acting within his official job duties for the speech at issue here, which precludes summary judgment for defendants.

>    *2.  Have van Heerden's Claims against Keel, Twilley and Voyiadjis Prescribed?*

Defendants Keel, Twilley and Voyiadjis claim that the one year limitations period for § 1983 claims has passed, rendering van Heerden's claims prescribed.[6] This suit was commenced on February 10, 2010, (*see* Complaint, Doc. 1-2), and therefore all acts must have occurred within one year of that date to satisfy the statute of limitations.

Van Heerden was asked in discovery by each defendant to provide the specific acts and events giving rise to his retaliation claims against them. (*See, e.g.*, Keel Interrogatories Nos. 1, 3 and 6, Doc. 87-3, pp. 4-5). All defendants submitted substantially the same interrogatories on this topic, and van Heerden filed deficient initial responses (*see, e.g.*, van Heerden's Answers to Keel Interrogatories, Doc. 87-4, pp. 26, 28, 29). The magistrate judge ordered amended responses to each of defendants' interrogatories regarding his retaliation claim (Doc. 60, pp. 23-27), and van Heerden had to file supplemental and amended answers to the interrogatories (Doc. 87-5, pp. 22-24). In response, van Heerden incorporated the same answer to all of their requests, setting forth a narrative in response to LSU's Interrogatory No. 6. This response thus constitutes the scope of van Heerden's retaliation case. (*See* Doc. 87-5, pp. 9-14 (narrating events giving rise to the alleged campaign of retaliation and harassment)).

i.    Claims against Keel are Prescribed.

Van Heerden's interrogatory response does not specify what his later-filed affidavit seeks to tack on—that Keel and Twilley jointly removed him from his position as deputy director of the LSU Hurricane Center, from which he received additional

_____

[6] Since federal law does not provide a statute of limitations for § 1983, "the applicable statute of limitations is that which the state would apply in an analogous action in its courts." *Bourdais v. New Orleans City*, 485 F.3d 294, 298 (5th Cir. 2007). Louisiana's one year liberative prescriptive period is applied to § 1983 claims. *Id.*

compensation on top of his normal faculty salary. (*Compare* Amended Answer to Interrogatory, Doc. 87-5, pp. 9-14, *with* van Heerden Affidavit, Doc. 86-1, pp. 1-8). The affidavit is dated July 5, 2011, while the interrogatory response is dated February 11, 2011. "[F]acts that should have been revealed during discovery, and are later raised by means of affidavits, are clearly inappropriate." *W.G. Pettigrew Distributing Co. v. Borden, Inc.*, 976 F.Supp. 1043, 1051 (S.D. Tex. 1996) (citing Fed. Rule Civ. P. 26). Rule 26(e)(1) provides that a party who has given a discovery response must supplement or correct its response in a timely manner if the party learns of additional information not otherwise made known to the other party during discovery. Fed. Rule Civ. P. 26(e)(1)(A). In his initial affidavit, van Heerden asserts "I was … fired by defendants Keel and Twilley as Deputy Director of the Hurricane Center. I found out about my termination as Deputy Director of the Hurricane Center from reading the newspaper." (van Heerden Affidavit, Doc. 86-1, p. 8). The record does not reflect why van Heerden failed to originally disclose this material fact. Moreover, the fact that van Heerden was specifically ordered by the magistrate judge to provide more detailed responses to interrogatories, and his failure to include this fact, precludes van Heerden from asserting it now. The Court therefore must disregard this allegation in his affidavit.

Van Heerden also filed a declaration alongside his memorandum in opposition to Keel's motion for summary judgment to support his allegation that Keel and Twilley were behind his removal from the Hurricane Center. (Doc. 95-1, pp. 1-2). This declaration specifically alleges that van Heerden learned Keel and Twilley were behind his removal from the Hurricane Center from Dr. Joe Suhayda, the man who became director of the Hurricane Center. (*Id.*). This declaration is dated July 26, 2011, and it

attaches an email from Dr. Suhayda to van Heerden dated April 14, 2009. Clearly, van Heerden had knowledge of this material fact at the outset of this litigation. For the same reasons discussed above regarding his first affidavit, van Heerden cannot at this juncture raise a new factual matter. Fed. Rule Civ. P. 56(e)(1)(A). Van Heerden had specific knowledge of the fact that Keel and Twilley may have been behind his removal from the Hurricane Center from the beginning of this litigation. He failed to allege that fact in his complaint and failed to bring it up in his discovery response, yet now he seeks to assert it even though discovery has ended. (*See* Docs. 66, 108 (orders relating to discovery deadlines)). The facts in his declaration must also be disregarded.

The remaining facts cited in van Heerden's interrogatory response in support of his case against Keel are all prescribed, as the latest allegation occurred, according to van Heerden, in the summer of 2007. (*See* Doc. 87-5, pp. 12-13). Summary judgment in favor of Keel on van Heerden's § 1983 claim is therefore proper.

        ii.     Claims against Twilley and Voyiadjis are Prescribed.

For the same reasons the claims against Keel are prescribed, van Heerden's § 1983 claims against Twilley are also prescribed. According to van Heerden's incorporated interrogatory response, the latest occurrence of Twilley's allegedly retaliatory action came in September 2008, well over one year before suit was filed. (*See* Doc. 87-5, p. 13). The claims against Voyiadjis are also prescribed. In van Heerden's incorporated interrogatory response, no instance of retaliation is alleged against Voyiadjis that occurs after February 10, 2009. (Doc. 87-5, pp. 9-14).

        iii.    Van Heerden Cannot Use a Continuing Violation Theory Because the Alleged Acts of Retaliation for Exercising First Amendment Rights are Discrete Acts.

Van Heerden attempts to import jurisprudence from the Title VII hostile work environment arena into his § 1983 First Amendment retaliation claim to save it from prescription by attempting to use a continuing violation theory.  As the Fifth Circuit has noted, though, "courts, including this one, are wary to use the continuing violation doctrine to save claims outside the area of Title VII discrimination cases."  *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 866 n. 27 (5th Cir. 1993).   The Supreme Court has held that discrete discriminatory acts constitute separate, actionable instances of unlawful discrimination such that the continuing violation theory is inapplicable.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Further, as the Court held in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), the First Amendment provides state employees with an actionable First Amendment retaliation case for "even an act of retaliation as trivial as failing to hold a birthday party for a public employee … when intended to punish her for exercising her free speech rights."  497 U.S. at 76, n. 8 (internal quotations and citations omitted).  Because *Rutan* recognizes that instances of retaliation for exercising First Amendment rights are almost always actionable, they almost always constitute discrete acts which do not admit of aggregation for purposes of pressing a continuing violation argument.  *See, e.g., O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006) (disallowing aggregation of discrete retaliatory acts for purposes of statute of limitations when actions related to § 1983 First Amendment retaliation claim).  Van Heerden has cited no provision of law to the contrary.  Van Heerden cannot combine separate, discrete instances of First Amendment retaliation into a continuing violation for purposes of his § 1983 claims.

*3.  Could a Jury Find Constant Harbored a Retaliatory Motive?*

In van Heerden's incorporated interrogatory response to Constant's interrogatory regarding the particulars of his retaliation claim, van Heerden asserts that Constant terminated him on April 9, 2009. (Doc. 87-5, pp. 13-14). This response, unlike those for the other defendants, alleges an act that has not prescribed. Moreover, as the other evidence makes clear, genuine issues of material fact remain which preclude summary judgment on this claim.

To establish a § 1983 claim for retaliation related to First Amendment speech, plaintiffs must prove four elements: (1) plaintiff suffered an adverse employment action; (2) plaintiff spoke as a citizen on a matter of public concern; (3) plaintiff's interest in the speech outweighed the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007). To establish the last element of causation, the plaintiff must show his protected speech "was a substantial or motivating factor behind the defendant's action." *Brady v. Houston Ind. Sch. Dist.*, 113 F.3d 1419, 1423 (5th Cir. 1997). The Court discusses each element in turn.

Constant does not brief the issues relevant to the first three elements. He does, however, strongly dispute the causation element. It is undisputed that the non-renewal of van Heerden's employment constituted an adverse employment action. The first element is therefore established.

As the Court found above, van Heerden spoke as a citizen and not simply pursuant to his *Garcetti* job duties when he made the relevant speech at issue in this case. It is undisputed that the primary matter on which plaintiff spoke—the cause of the flooding in New Orleans after Hurricane Katrina, which van Heerden has consistently

asserted occurred due to the negligence of the Corps—was and is a matter of enormous public concern, for quite obvious reasons. Moreover, because plaintiff brought his employment grievances beyond the university chain of command and out into the general public—including to state and federal legislative bodies, in articles in the press, and in his book "The Storm"—plaintiff has also created a genuine issue of fact regarding whether those actions were matters of public concern. *See Davis*, 518 F.3d 304. The second element is therefore established.

The plaintiff's interest in his speech could also arguably outweigh the defendant's interest in efficiently providing services. Academics are, by the very nature of their employment, urged to make what is sometimes unpopular speech. Universities must be cognizant and tolerant of such speech in order to foster the requisite level of comfort so research can be undertaken free of detrimental political pressure. The only conceivable "efficiency" interest LSU or the other defendants may have had in suppressing van Heerden's speech, so far as the evidence at this point suggests, was to curry favor with the Corps and other federal bodies in the hopes of receiving federal funding in the wake of Katrina. Defendants do not even attempt to argue van Heerden did not meet this prong of the test. A genuine issue of fact certainly exists under the third element regarding whether plaintiff's interest in his speech outweighs whatever LSU's efficiency interest may be.

Constant contests solely the fourth element, suggesting no evidence exists from which to infer he held a retaliatory motive. He also asserts that van Heerden's interrogatory answer failed to specify other acts, aside from the termination itself, which could support the retaliation claim. The interrogatories propounded by Constant speak

to acts that themselves constitute retaliation; they do not ask for revelations concerning possible retaliatory motive. (*See* Constant's Memo. in Support, Doc. 94-1, pp. 6-8 (quoting Interrogatories Nos. 1, 4 and 6 from his discovery requests, which seek identification of retaliatory acts attributed to Constant)). Thus, the sole instance which van Heerden identified as constituting a retaliatory *act*—the termination—can be supported by other evidence showing potential retaliatory *motive* for the act.

Indeed, van Heerden identifies such circumstantial evidence by pointing to an email from Constant's assistant in February 2009 which apparently shows that Constant was already considering not renewing van Heerden's employment. (Maureen Robertson email to Lillian Kleinpeter dated February 10, 2009, Doc. 77-2, pp. 51-52). This could undercut Constant's testimony that budget cuts were the basis for the non-renewal, especially if it could be shown that the budget situation in February 2009 differed from the budget situation in April 2009.

Moreover, while defendants consistently testified at the preliminary injunction hearing that budgetary reasons were the basis for van Heerden's termination, some documents in evidence show efforts to hire new faculty members for substantially the same position that van Heerden occupied, despite the supposed budgetary constraints. (Doc. 86-5, p. 34; Doc. 31-2, p. 1; Doc. 77-2, Ex. 7, pp. 5-19). Van Heerden asserts in his affidavit, and his faculty representative, Dr. Chip Delzell, corroborates in his deposition, that Constant did not cite budgetary reasons when he personally met with both of them to inform van Heerden of his non-renewal. (van Heerden Affidavit, Doc. 86-1; Delzell Deposition, Doc. 77-4, pp. 6-10). Additionally, there are emails in

evidence which could be read to show LSU officials discussing after-the-fact justifications they could offer for van Heerden's non-renewal. (Doc. 77-2, p. 53).

While the Court concludes below that van Heerden has no breach of contract claim for deviations from LSU's established policies on faculty reappointment decisions as expressed in Policy Statement 36, record evidence nonetheless suggests significant deviations from LSU's normal employment policies occurred. Specifically, Constant testified at the injunction hearing that he and two other faculty members alone made the decision to not renew van Heerden's contract. (Transcript of Injunction Hearing from May 20, 2010, pp. 43-49, 101). The faculty meeting and vote on van Heerden's appointment was conducted in late April and early May of 2009, well after the non-renewal decision had already been made. (*Compare* Non-Renewal Letter dated April 3, 2009, Doc. 77-1, Ex. B, p. 21 *with* Faculty Evaluation for van Heerden Reappointment, Doc. 77-1, Ex. C, pp. 22-24). Constant's decision appears to depart from the procedures outlined in PS-36.V.B which, while not contractual in nature, do establish University norms. (*See* PS-36, Doc. 49-8, pp. 1-35). The deviations could permit an inference of irregularity in handling van Heerden's non-renewal, which may augment van Heerden's arguments for retaliatory motive.

Constant cites *Brady*, 113 F.3d 1419, as supporting his contention that a retaliatory motive would be highly unlikely given the length of time between the protected speech and the adverse action. It is generally true that retaliatory motives grow less likely as time passes, but the Court cannot close its eyes to the evidence on record suggesting van Heerden's non-renewal could have been based on retaliatory

motives.  Significant disputes of material fact exist regarding possible retaliatory motive, and summary judgment is therefore improper as to Constant.

B.  Section 1985 Claims

The parties afford relatively little space in their briefs to separately address the § 1985 conspiracy claims.  At times, the parties appear to treat the § 1985 claims as an afterthought to the § 1983 claims; at other times, van Heerden appears to contend § 1985 is a general federal tort statute for conspiracies.  However, § 1985 is a narrow provision dealing with intimidation of parties, witnesses or jurors in federal court.[7]  While plaintiff in his memoranda and affidavit makes assertions that LSU officials told him he would be fired if he testified for certain litigations, van Heerden identifies no such instance occurring within one year of the commencement of this action.  Section 1985, like Section 1983, has a one year prescriptive period.  *See, e.g., Cleveland v. Union General Hosp.*, No. 07-00119, 2007 WL 4693806, at *2 (W.D. La. Nov. 14, 2007) (noting "the same prescriptive period applies if the claim is brought under § 1985").  Because van Heerden cannot point to any evidence supporting a viable § 1985 claim occurring on or after February 10, 2009, his § 1985 claims have no merit, and defendants are entitled to summary judgment.

C.  IIED Claims

Plaintiff has also failed to put forward sufficient evidence to support a claim for intentional infliction of emotional distress ("IIED").  To recover for IIED, a plaintiff has the

---

[7] 42 U.S.C. § 1985(2)-(3) states in pertinent part: "If two or more persons in any State … conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

burden of proving: (1) that the conduct of the defendants was extreme and outrageous; (2) that the emotional distress suffered by him was severe; and (3) that the defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct. *White v. Monsanto Co.*, 585 So.2d 1205, 1209-10 (La. 1991). The conduct complained of must be so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community. *Id.* Liability arises only where the mental suffering or anguish is extreme, and the distress suffered must be such that no reasonable person could be expected to endure it. *White*, 585 So.2d at 1210. "A plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger." *Id.* Claims of IIED are torts subject to a one year prescriptive period. *Bustamento v. Tucker*, 607 So.2d 532, 536 (La. 1992).

Defendants argue that van Heerden's IIED claims are either prescribed or do not meet the threshold level of extreme and outrageous conduct. Even assuming without deciding that plaintiff's claims are not prescribed, the Court simply fails to detect the presence of any factual allegations rising to a level sufficient to support IIED liability. *White* sets a high bar, and subsequent cases have adhered to that standard. *Nicholas v. Allstate*, 765 So.2d 1017 (La. 2000) noted that "this state's [IIED] jurisprudence has limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time." 765 So.2d at 1026. But that court also noted that "sexual harassment as a categorization of employer/supervisor misconduct is perhaps the most often recognized claim under a theory of intentional infliction of emotional

distress." 765 So.2d at 1026, n. 12.  Moreover, the catalogue of cases *Nicholas* cited with approval in its canvassing of national IIED jurisprudence shows that the *White* standard still requires even an employer or supervisor to exhibit conduct meeting "the high threshold of extreme and outrageous conduct."  *Id.* at 1029, n. 20.

No direct correspondence from any defendant to van Heerden exhibited such outrageous behavior, indicating a lack of intent by any defendant to inflict emotional distress.  The *New York Times* letter submitted by LSU administrators did cast aspersions on van Heerden's qualifications and competence, but it simply did not rise to the level of outrageousness required to prove liability.  Moreover, the overlooked second element spelled out in *White*—that plaintiff must actually suffer severe emotional distress—has not been argued at all.  In short, nothing in the record provides concrete support for the proposition that defendants' conduct rose to an extreme and outrageous level.  The record evidence shows their conduct at various times may have been rude, unfair, mean, or calculated to embarrass van Heerden, but none of it contains that extra dose of cruelty necessary for the Court to conclude it was intended to cause severe distress.  Defendants are therefore entitled to summary judgment on the IIED claims.

D.  Breach of Contract Claim Against LSU

This claim arises based on van Heerden's reliance on LSU Policy Statement 36 ("PS-36"), which specifies University policy for personnel decisions.  The Introduction to LSU Policy Statements makes clear that they "are established for the purpose of campus governance" pursuant to "the University's chosen method of managing its affairs."  (Introduction to LSU Policy Statements, Doc. 110, Ex. A, p. 24).  However, the Introduction also explicitly states that "Policy Statements do not form a part of any

employee's contract or appointment with the University." (*Id.*). Policy Statement 36 certainly embodies a general policy of utilizing peer judgment in making important personnel decisions, (PS-36, Doc. 49-8, Ex. F, p. 1), but this provision comes with a disclaimer in bold font similar to the one found in the Introduction to LSU Policy Statements. It reads:

> This policy statement does not increase or diminish the legally enforceable rights of the University and its employees. While strict adherence to this policy statement is expected, minor procedural errors may occur. The misapplication or failure to follow any specific provision of this policy statement should not be of itself grounds for setting aside or modifying any employment decision when it has been determined by appropriate authority that the decision was fairly made and in the best interest of the University.

(PS-36.I, Doc. 49-8, Ex. F, p. 2). Section V of PS-36 goes on to spell out the normal procedures for decisions on the reappointment of faculty members.

The preceding disclaimers, however, make clear that the listed procedures in PS-36 are simply the general policy of the University, which expressly reserves to itself the right to deviate from those policies at times. As Section V.A.1 of PS-36 makes clear, "[a] term appointment or a series of term appointments carries no assurance of reappointment, promotion or tenure. *Reappointment is made solely at the initiative of the University.*" (PS-36.V, Doc. 49-8, Ex. F, p.14) (emphasis added). Thus, the argument that PS-36 constitutes a part of van Heerden's contract is untenable. Louisiana jurisprudence on the non-contractual nature of faculty handbooks and university policies confirms this conclusion. *See, e.g., Stanton v. Tulane Univ.*, 777 So.2d 1242 (La. App. 4th Cir. 2001). Plaintiff cites not a single case or provision of law, apart from the PS-36 procedures themselves, to rebut the plain text of the policy

statements and supporting case law.  The breach of contract claim against LSU has no merit, and summary judgment is therefore granted.

## V.  CONCLUSION; ORDER

For the foregoing reasons, the Court GRANTS the motions for summary judgment by defendants Keel, Twilley and Voyiadjis on van Heerden's claims for First Amendment retaliation under 42 U.S.C. § 1983, conspiracy under 42 U.S.C. § 1985, and intentional infliction of emotional distress under state law.

The Court GRANTS defendant Constant's motion for summary judgment on van Heerden's claims for conspiracy under 42 U.S.C. § 1985 and intentional infliction of emotional distress under state law.  The Court DENIES Constant's motion for summary judgment for First Amendment retaliation under 42 U.S.C. § 1983.

The Court GRANTS defendant LSU's motion for summary judgment on van Heerden's claims of intentional infliction of emotional distress and breach of contract under state law.

Signed in Baton Rouge, Louisiana, on October 20, 2011.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**